**RECORD IMPOUNDED**

NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5370-13T3

NEW JERSEY DIVISION OF CHILD
PROTECTION AND PERMANENCY,

    Plaintiff-Respondent,

v.

K.G.,

    Defendant-Appellant,

and

V.M., Sr.,

    Defendant.
_____

IN THE MATTER OF V.M., Jr.,

    a Minor.
_____

<table>
<tr><td>

**APPROVED FOR PUBLICATION**

**May 2, 2016**

**APPELLATE DIVISION**

</td></tr>
</table>

        Argued March 15, 2016 – Decided May 2, 2016

        Before Judges Reisner, Hoffman and Whipple.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Union County, Docket No. FN-20-170-13.

        Barbara E. Ungar argued the cause for appellant.

        Mary C. Zec, Deputy Attorney General, argued the cause for respondent (Robert Lougy, Acting Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Zec, on the brief).

Damen J. Thiel, Designated Counsel, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Mr. Thiel, on the brief).

The opinion of the court was delivered by

REISNER, P.J.A.D.

Defendant K.G. appeals from a February 21, 2014 fact-finding order, determining that she abused or neglected her ten-month-old baby, V.M., Jr. (Valentine or the baby), by leaving him under the sole supervision of her nineteen-year-old son Carl,[1] who is substantially cognitively impaired. Applying the totality of the circumstances test, we agree with the trial judge that defendant's conduct was grossly negligent and we affirm.

I

The following evidence was presented at the fact-finding hearing. Defendant lives in a single-family house with Carl and Valentine. On May 18, 2013, the Division of Child Protection and Permanency (Division or agency) received a referral from Carl's father, V.M., Sr., reporting that defendant was leaving Valentine alone with Carl, who was not capable of caring for him. On May 19, 2013, Division caseworker Priscilla Garcia visited defendant's home and spoke to her about the referral.

---

[1] We use initials and pseudonyms to protect the family's privacy.

Defendant said there was "nothing wrong" with Carl being the baby's caretaker and told Garcia that she would leave the baby in Carl's care if she went to the supermarket or ran other errands. She told Garcia that Carl was not receiving services from the Division of Developmental Disabilities (DDD), and that he was enrolled in school and working at a local hospital.[2] However, when Garcia attempted to speak to Carl, he went to his room, and defendant told Garcia that Carl did not want to talk to her. Garcia left without completing her investigation. She later made several attempts to arrange a time when she could speak to Carl, but defendant told Garcia that "she wasn't able to accommodate [Garcia's] schedule."

On June 12, 2013, V.M., Sr., phoned the local police headquarters to express concern for the baby's safety. Officer Pearson, a uniformed patrol officer, was dispatched to defendant's residence at about 8:50 p.m. to do a welfare check. Pearson knocked on the front door, announcing himself as a police officer, but got no answer. Eventually a man came to a second floor window and peeked his head out. Pearson attempted to speak to the man, but still no one came to the door. He

---

[2] Defendant omitted some significant information in her statement to Garcia, including the fact that Carl attended a special school for persons with developmental disabilities and that, as of March 2012, she had Carl evaluated by DDD for continuing services.

started knocking again and noticed that the door knob was unlocked. Pearson opened the door and stepped inside, announcing his presence. The same man who had been at the window was in a doorway. When the man saw Pearson, he ran upstairs and slammed a door shut. Pearson walked around inside the house, announcing that he needed to talk to someone. Eventually the man came out and identified himself as Carl.

According to Pearson, Carl was very protective of his baby brother. He told Pearson that Valentine was upstairs sleeping, and that Pearson had to be quiet and had to leave. After a while, Carl let Pearson go upstairs to check on the baby. Valentine was asleep in a crib; he appeared clean; the physical environment appeared safe.

Pearson testified that he went back downstairs to talk to Carl. His initial impression was that Carl seemed childish for his age — very shy and "a little off with his behavior and speech." Pearson tried to put Carl at ease by talking about sports and Carl's favorite teams. Pearson then asked Carl "what he would do if the house was on fire or if he needed an ambulance," and Carl replied, "I don't know." When Pearson asked Carl "if he could call his mother," Carl was "unable to answer" that question either. Pearson did not feel it would be appropriate to leave the baby with Carl so he called for backup.

After other officers arrived on the scene, Pearson's sergeant asked headquarters to contact defendant.

Pearson estimated that he was at the house for about an hour before defendant arrived home. She was very agitated and cursed at the officers. According to Pearson, Carl asked defendant what was going on and she replied, "they think you're too fucking retarded to watch your brother." Carl ran into his room. Pearson's sergeant then contacted the Division so that the agency could assess the situation.

Patricia Arroyo, a Division emergency response investigator, testified that she arrived at defendant's residence at approximately 10:30 p.m. When defendant refused to allow Arroyo to interview Carl, Arroyo threatened to conduct a Dodd removal[3] of Valentine. At that point, defendant allowed Arroyo to speak to Carl. After interviewing him, Arroyo prepared a report memorializing her observations that Carl had "a major mental disability[,]" he did not know defendant's phone number, and he did not have access to a telephone to call 911 in case of an emergency. Before leaving the home, Arroyo prepared a safety protection plan, signed by defendant, that required defendant to make alternate plans for babysitting and to provide

---

[3] Pursuant to N.J.S.A. 9:6-8.29, legislation sponsored by Senator Dodd, the Division is authorized to take custody of a child on an emergency basis in order to protect the child's safety.

the Division with the name of any new caregiver.

Garcia testified that after the court granted the Division care and supervision of Valentine, she was able to speak with Carl at his school. He attended a specialized school that teaches life skills to children who are developmentally delayed. Carl, who was nineteen years old at the time of his interview, was cooperative but his demeanor was childlike. He appeared very shy; he giggled and his conversation bounced from topic to topic. Carl told Garcia that he worked at a hospital cafeteria on Thursdays and said he liked his job very much. He explained that when he got home from school he changed his clothes, ate a snack and played video games. When Garcia asked Carl if he was ever left in charge of caring for his little brother, he first said that he did not know and later said, "hold up, hold up, oh maybe sometimes." He could not recite his mother's phone number or his home phone number, and had trouble answering the question whether his mother was there when he got home from school. Carl did tell Garcia that he loved his mother very much.

Garcia testified that she later met with defendant and attempted to explain why Carl was not an appropriate independent caregiver for Valentine. Defendant told Garcia that she disagreed. At that meeting in July 2013, defendant told Garcia that there was still no land line in the home and while

defendant had a cell phone, Carl did not.

Ronald Wasserman, a Senior Community Program Specialist for DDD, testified concerning an assessment he performed on Carl in April 2012. Defendant had called DDD to register Carl so that he could obtain services once he turned twenty-one, and she participated in the assessment. Wasserman explained that the purpose of the assessment was to verify that Carl was developmentally disabled and eligible for services from DDD, as opposed to another agency such as the Division of Mental Health.

Wasserman found that Carl has "substantial functional limitations" in his capacity for independent living, learning, self-direction, and receptive and expressive language. His full scale IQ was measured at 51. His overall capacity for independence was like that of a seven-year-old child. Wasserman was "[a]bsolutely" satisfied that Carl qualified for DDD services and that he would receive those services for the rest of his life. In Wasserman's opinion, Carl will never be able to live on his own.

Ms. Tillis, an assistant principal at Carl's school, testified that Carl has attended the school for four-and-a-half years. His studies include English, Math, Music, Art, Physical Education, Health and Computers. The school does not offer a first aid course, but he has studied very basic safety skills in

health class.  Carl also participates in a community work program where he is assigned to jobs at an environmental center and at a local hospital.

According to Tillis, Carl is a very sweet boy who tries hard and wants to be successful in school.  He is developmentally delayed, has a below average IQ, and functions well below age level both academically and cognitively.  He is performing well academically but his classes are taught at the second to third grade level.  He has made progress slowly, but his cognitive ability is that of a second or third grade student.

Tillis explained that when Carl gets upset he has trouble expressing himself.  He may be confused by questions and can become emotional when he gets into difficulty.  He receives very strong supervision at school.  He is bused to and from school, and he cannot leave the school grounds unaccompanied.  A job coach stays with him at his work assignments, and does not leave him alone for more than ten minutes at a time.

Carl was subpoenaed by the Division to testify at the fact-finding hearing.  He was able to identify the town where he lived, and said he wanted to "find a real job" when he finishes school.  When asked if he ever talked to a policeman, he responded, "No.  Never . . . . Please, next question."  He

became very upset when asked about the events of June 12, 2013, saying he did not remember a police officer coming to his house, but then saying, "I thought a robber." Judge Kenny attempted to soothe Carl, but the attorneys' arguing increased his agitation. Carl exclaimed, "I don't want to hear this." At that point, Judge Kenny took over the questioning to put Carl at ease.

Carl told the judge he likes working at the environmental center where his job involves "[c]ut—cut, tracing. No. Cut footprints and—yeah, footprints, a lot of things. . . . [D]o more ventures outside, pick up leaf, acorn and pinecones." He said he preferred his job at the hospital where "[y]ou deal with trays . . . . You do the stocking of drinks and stuff, the utensils, napkin, fork, knife . . . [s]weeping floors." He said he was good at basketball and he played "probably defense or offense."

When the Deputy Attorney General said she would like to ask Carl some questions about his baby brother, he responded, "Okay. Do that crap." Carl testified that he likes playing with Valentine, and he feeds him baby food that he gets from the pantry at his house. Carl could not remember how old Valentine is, but did recall that Valentine likes to eat "[t]hat little vegetable soup." He had trouble explaining what Valentine drinks. He said that to make a bottle for the baby, he would

"[m]easure the formula" and "[h]eat it up in the microwave and give it to him." He thought that he heated it in the microwave for "25 minutes."

Carl testified that Valentine has never started coughing while eating baby food, but if he did, Carl would "give him the vegetable juice." Carl changes Valentine's diapers without his mother's help: "I like to change my little baby brother's diaper." He likes to spend one-on-one time with his brother. If Valentine cries, Carl gives him a bottle or plays with him.

Carl stated that he "[p]robably" watches Valentine when his mother is not home. He never leaves the house with the baby. He testified that he had an iPhone and a house phone and was able to tell the judge his cell phone number. If something bad happened while he was watching Valentine, Carl would call 911 and tell them that there is "[a] fire at my house." Carl stated that if a police officer came to the house, he would not answer the door. When asked again if he would answer the door for a police officer, Carl replied, "No. Never. Wow."

Carl became agitated when the Law Guardian started cross-examination, saying, "Oh, God. Her?" He responded to questions with "Why you ask that question?", "Now you got the question. Go ahead. Go ahead. Go ahead.", and "Ask your stupid questions." He also had a "laughing fit" in the midst of

questioning.

Carl was more cooperative with defense counsel, testifying that there is a baby monitor at his house and that he knows how to use it. He also described how he would make a call using numbers stored on his cell phone. He explained Valentine's feeding schedule, how he bathes the baby, and how he checks the baby's temperature with a thermometer. He said that Valentine loves him but is not attached to his mother.

Zachary B., who testified on behalf of defendant, stated that he has known Carl his entire life and has often seen him interacting with Valentine. Zachary observed Carl preparing Valentine's bottle, feeding him, and changing his clothes. Sometimes defendant would go out, leaving Carl and Valentine home with Zachary and Zachary's father. During those occasions, Carl took care of Valentine for the whole day and never asked for any help.

Elizabeth B., a long-time friend of defendant, also testified on defendant's behalf. Elizabeth stated that Carl loves Valentine very much and is good with him. She has seen Carl taking care of Valentine ever since the baby's birth and has never observed him doing anything inappropriate. He knows how to give Valentine a bath and to set up the baby monitor in Valentine's room.

Vincent Nardone testified that he was at defendant's house on June 12, 2013, doing some maintenance work in the garage and yard. He recalled that defendant left the house around 7:00 p.m. and returned home with the baby at 7:30 p.m. Nardone left for the day at 8:00 p.m. At that point, there were no police officers at the house.

Dr. Lidia Dengelegi Abrams, a psychologist with considerable relevant experience, evaluated Carl at defendant's request in October 2013 to assess whether he could safely care for Valentine. She testified that for the first half hour of the appointment, she spoke with Carl while he held Valentine on his lap. Later, Carl gave the baby to defendant so that he could take a battery of tests that Abrams had prepared.

Abrams observed that Carl was pleasant and cooperative. He focused on Valentine, held him appropriately, and was very aware of his needs. In fact, even after Valentine was given back to defendant, Carl was more attuned to what the baby was doing in the waiting room than to what Abrams was saying. Abrams concluded that Carl has an extremely strong bond with Valentine. Indeed, it appeared to Abrams that the baby was more attached to Carl than to defendant. At the end of the visit, Carl took Valentine to defendant's car, locked him into his car seat, and then waited for defendant to finish speaking to Abrams. She

12                                                    A-5370-13T3

observed that Carl handled the baby very well and there was an easy relationship between the two.

With regard to the testing, Abrams found that Carl has a cognitive impairment and that his basic skills in reading, writing, and math are very poor. She found that he is in the mildly mentally disabled range with an IQ of 62. According to Abrams, individuals with Carl's IQ can work and can do many other things. While some people with cognitive impairments have other issues such as behavioral outbursts or psychiatric disorders, Carl does not. He is emotionally and mentally stable. Abrams testified that a person with a cognitive impairment may be capable of caring for a baby under the right circumstances:

> A certain amount of cognitive ability is necessary to take care of another person. And the environment where that is done, if it's a more complex environment, then it's harder to take care of that person. If it's a simple environment where the individual has learned how to handle all the potential situations that might come up, then such a high IQ is not required.

Abrams opined that even though Carl's academic skills are at a second-grade level, he is at an adult level in terms of his understanding of the importance of keeping his brother safe. While Abrams agreed with DDD's determination that Carl has a low IQ and is "substantially functionally limited[,]" she did not

think that his limitations impacted his ability to care for Valentine "within the constraints of his home." She believed that it was safe for Valentine to be left in Carl's care on June 12, 2013. In rendering that opinion, Abrams stated her understanding that Carl had "a long history of caring for [the] baby" and "has never done anything inappropriate." She also explained her understanding that Carl did not "have panic attacks."

Abrams further based her opinion on her belief that Carl was able "to call his mother or 911 if there was something wrong." She was told by Carl that when caring for the baby, he "always has his phone in his hand." She explained her understanding that during the June 12, 2013 incident, Carl saw one or more strangers at the door, and rather than answering the door, he locked himself in a closet with the baby monitor and called his mother. She opined that he did so "[b]ecause he didn't know who the people were, and he didn't want to deal with them" and "because he understands his own limitations and doesn't want to expose himself and his brother to situations which he may not be able to handle."

Abrams opined that Carl could care for his baby brother by himself "in his own home . . . with intermittent phone calls at least from his mother." She recommended that to safely care for

the baby, Carl should always have a working phone and defendant should always be available by phone to respond to a potential problem.

On cross-examination, Abrams said she thought it was established that Carl had a cell phone on the day of the incident, had hidden in the closet, and had called his mother. However, her understanding of what happened that night was based on information that defendant had provided. She admitted that if Carl had been left alone with Valentine without a working phone it would not be acceptable: "[T]hat would be endangering the welfare of [the baby] if . . . [Carl] was left in the home without a phone."

Abrams admitted that Carl had difficulty explaining his daily routine to her, he had trouble telling time, and he was very dependent on having a set daily routine. If there were "a difficulty thrown into that routine," she admitted that "[h]e might have a problem." She was "not sure" what Carl would do if there were a fire in the house and a fire fighter came to the door. She testified that Carl "could be further educated on that, and then he would know" to open the door for a police officer or fire fighter. Otherwise, in an emergency, they would have to "break the door down" to get into the house.

When asked what Carl would do if the baby started choking, Abrams responded: "Not sure what he would do in that case. It's a good question." When further asked, "Do you think he would panic?" she replied, "I don't know what he would do." Abrams also admitted that Carl typically "retreats" when he is "unhappy with a situation." Nevertheless, she did not think he would ever leave the baby alone, because his love for the baby would be stronger than his need to retreat.

Although she based her opinions, in part, on Carl's past history of successfully caring for the baby, Abrams admitted on cross-examination that she did not know on how many occasions prior to June 12, 2013 Carl had been left alone to care for the baby, or for how long he was left alone with him. Apparently she never asked defendant or Carl that question. She stated, "I'm just guessing here."

Defendant also testified at the hearing. According to defendant, when Garcia visited her home to investigate the May 18, 2013 complaint, Garcia told her that V.M., Sr., had alleged that she left Carl alone with the baby for days at a time and left no baby care supplies in the house. According to defendant, she told Garcia that she only allowed Carl to watch the baby if she ran out for "an occasional errand or nearby to a grocery store." Contrary to Garcia's testimony, defendant

testified that when Garcia visited her home on May 19, she was able to interview Carl. Defendant testified that Garcia inspected her entire house and left without expressing any concerns. Defendant received a letter from the Division in July 2013 notifying her that the May 18, 2013 allegations were determined to be unfounded.[4]

As to the events of June 12, 2013, defendant testified that she picked Valentine up from daycare at about 7:00 p.m. She got home with him at 7:30 p.m., started a load of laundry, changed him into his pajamas, gave him a bottle and put him down for bed around 7:50 p.m. At that time, Carl and Nardone were loading trash into Nardone's truck. Defendant got into her car to go to the grocery store to buy bread and milk. She testified that she left her house at about the same time that Nardone left.

---

[4] The July letter, which is in the record, stated that the May 18 neglect allegations were unsubstantiated but that the Division would continue to provide services to defendant and her family. However, the Division's contemporaneous reports corroborate Garcia's version of her visit to the home, particularly her inability to interview Carl. Although Garcia was not permitted to testify about details, the allegation about Carl caring for the baby was but a small part of the May investigation. Garcia was also investigating other serious allegations that V.M., Sr. had made about defendant, including that she used illegal drugs, engaged in prostitution, and involved Carl in her prostitution business. We have not considered the substance of any of those allegations; however, in context, the Division's overall determination that child abuse or neglect was not substantiated did not signal approval of defendant leaving the baby alone with Carl.

Before she left she told Carl that Valentine was asleep for the night, she would not be gone long, and he should "just call me" if he needed her.

Defendant asserted that she always had a working telephone at her house including on the night of June 12, 2013. She stated that she had three land-line phones, one in the kitchen, one in her bedroom and one in Carl's room. According to defendant, Officer Pearson used one of the kitchen telephones to call his supervisor that night. She also testified that Carl had an iPhone with her telephone number and other important phone numbers pre-programmed into it.

According to defendant, she was only gone from the home for a total of fifteen minutes; she contended that the Division report memorializing her admission that she was at the store for thirty-five to forty minutes was the result of a "miscommunication." Defendant testified that she left the house at about 8:00 p.m., and called Elizabeth B. on her cell phone while she drove to a local ShopRite supermarket. Defendant testified that she walked into the ShopRite while on the phone with Elizabeth. A call then came in from Carl, who said that there was an intruder in the house and he thought it was a robber. Defendant "clicked" to Elizabeth to tell her that she had to go and then "clicked" back to Carl but he had already

hung up. Defendant testified that she abandoned her groceries and "jumped" in her car, and was driving home when she got a call from Pearson. She arrived home at 8:15 or "8:20 at the max." When she arrived, she found that Carl had locked himself in his bedroom closet, with the baby monitor and his cell phone.

Defendant testified that she was very angry with Pearson, and berated him for frightening Carl. She denied ever telling Pearson that she did not have a land-line phone in the house. She testified that she had a "miscommunication" with the Division caseworker, who thought Valentine had been left with Carl for a longer period than he really was. The caseworker said that Carl was unfit to supervise the baby, and defendant signed the safety plan that the caseworker prepared even though she disagreed with it.

Defendant testified that Carl has been caring for Valentine ever since the baby was born. Carl is very attuned to the baby, and loves to play with him. She has observed Carl changing the baby's diapers, feeding him, and mixing formula. He helps with the baby's baths and knows how to take the baby's temperature. He can warm food in the microwave and cook simple things if he has directions. Further, Carl has known the basic instructions for emergencies ever since he was seven years old, and knew how to call her in case of an emergency.

A-5370-13T3

Defendant acknowledged that Carl has significant academic limitations, but insisted that he has strong daily living skills. He does not wander from the house and does not put himself in situations that he cannot handle. She testified that, within the last year, the police were probably at her home four or five times due to problems she was having with V.M., Sr., and when Carl was at home, he reacted appropriately by taking the baby and going to his room.

Defendant testified that she is a "corporate franchise representative" who formerly owned three fitness centers. She testified that she would not be able to find anyone to invest in her fitness centers now that she has a substantiated finding of child neglect on her record.

On February 21, 2014, Judge Camille M. Kenny issued a comprehensive oral opinion, finding by a preponderance of the evidence that defendant neglected the baby by leaving him alone with Carl. Judge Kenny noted that everyone agreed that Valentine was "happy, healthy, clean, fed, bathed, [and] clothed." However, she found that defendant was grossly negligent in leaving Valentine home alone with Carl, whom defendant knew to be cognitively impaired and developmentally

disabled.[5]

In rendering her opinion, the judge found that the Division's witnesses were credible in their recollections of the events that occurred on June 12, 2013, and in their observations and assessments of Carl. On the other hand, the judge found that defendant's testimony was not credible. The judge also did not accept the testimony of defendant's expert witness, Dr. Abrams, because her opinions were premised on defendant's inaccurate version of events.

The judge noted that her impressions of Carl were consistent with the observations made by Pearson, Garcia and Tillis concerning his limited cognitive abilities and his inability to handle stressful situations. His typical mode of dealing with difficult situations was to run away and hide, as he did when Pearson arrived at the house. The judge noted Carl's testimony that he would "never" allow a police officer to enter the house.

The judge found that, while Carl could feed, diaper, and play with the baby "[u]nder his mother's supervision," he was

_____

[5] The judge made clear that she did not consider any inadmissible hearsay in reaching her decision. During the trial, the judge stated that she would disregard hearsay statements contained in the Division's case records. She also precluded the Division from admitting in evidence reports containing prejudicial hearsay statements from defendant's former boyfriend, V.M., Sr., with whom defendant had a hostile relationship.

unable to safely care for the child alone. The judge found that Carl did not like confrontation of any sort, had difficulty communicating when he was upset, and became upset very easily. Most importantly, Judge Kenny found that Carl would not be able to handle an emergency situation, should one arise while he was caring for Valentine, and that defendant exposed the baby to a serious, unjustified risk by leaving Carl alone with the baby for an extended period of time.

Judge Kenny credited Pearson's account of the amount of time defendant was gone from the house on the evening of June 12. She concluded that defendant did not come home until at least forty minutes after Pearson arrived at the house, meaning that Carl was alone with the child for more than an hour. The judge found defendant's testimony on the timing issue to be completely incredible. She did not believe that defendant was able to drive from her house in Union County to a ShopRite store several towns away and then return home within fifteen minutes.[6] Nor did she believe defendant's testimony that she only intended to run out for a few minutes to buy a few items.

The judge also did not believe defendant's testimony that

---

[6] During defendant's testimony, the judge asked her a series of questions which elicited defendant's turn-by-turn explanation of her route from her home to the ShopRite, including her admission that she needed to pass through at least two other towns between her home and the municipality in which the store was located.

Pearson phoned her around 8:15 p.m., shortly after she entered the ShopRite, to tell her to return home. Rather, she believed the officer's credible testimony that he did not even arrive at defendant's home until 8:50 p.m., that a police dispatcher called defendant after finding her phone number in a police file, and that it took defendant forty minutes to arrive home. The judge did not believe defendant's testimony that Carl phoned her that evening, crediting instead Pearson's testimony that Carl did not know how to reach his mother or call for help.

Judge Kenny found that there were no extenuating circumstances to excuse defendant's leaving the baby with Carl for an extended period of time. She noted that if the baby were sick, it might be reasonable to leave Carl in the car with the baby for a few minutes while defendant ran into a pharmacy to buy medicine. But there was no emergency on the evening of June 12. The judge noted that if defendant needed groceries, she could have picked them up on the way home with Valentine, whose daycare center was near the ShopRite.

The judge did not credit Abrams' expert opinion, finding that it was based on a misapprehension of the facts. Contrary to what Abrams believed to be the case, the judge found that Carl did not hide in a closet and call his mother, he did not know how to call 911 on the evening of June 12, 2013, defendant

23

was not readily available to him by phone and Carl was not able to communicate with Officer Pearson in any helpful way. The judge found that Carl was simply unable to handle the situation with which he was presented. The judge noted that "any reasonable 12-year-old . . . could have handled that situation and, in addition, been able to call his mother. [Carl] can't do that."

The judge concluded that a reasonable person would not have left Valentine alone with Carl for a prolonged period of time on June 12, 2013, and that defendant was grossly negligent in doing so.

                                II

Under Title 9, an "abused or neglected child" includes a child whose "physical . . . condition . . . is in imminent danger of becoming impaired" as a result of his parent's failure "to exercise a minimum degree of care . . . in providing the child with proper supervision[.]" N.J.S.A. 9:6-8.21(c)(4)(b). Even if a child is not actually harmed, "a finding of abuse and neglect can be based on proof of imminent danger and substantial risk of harm." N.J. Dep't of Children & Families v. A.L., 213 N.J. 1, 23 (2013). Under those circumstances, "the Division must show imminent danger or a substantial risk of harm to a child by a preponderance of the evidence." Ibid. "Moreover,

24

'[c]ourts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect.'" Dep't of Children & Families v. E.D.-O., 223 N.J. 166, 178 (2015) (quoting In re Guardianship of DMH, 161 N.J. 365, 383 (1999)).

A parent "'fails to exercise a minimum degree of care'" when her conduct is grossly negligent or where she "'recklessly creates a risk of serious injury'" to the child. Id. at 179-80 (citation omitted). "Any allegation of child neglect in which the conduct of the parent or caretaker does not cause actual harm is fact-sensitive and must be resolved on a case-by-case basis." Id. at 192.

In reviewing Judge Kenny's decision in this Title 9 case, we do not write on a clean slate. We may not disturb the judge's factual findings so long as they are supported by sufficient credible evidence. N.J. Div. of Child Prot. & Permanency v. C.W., 435 N.J. Super. 130, 139 (App. Div. 2014). And we owe particular deference to the judge's evaluation of witness credibility. N.J. Div. of Youth and Family Servs. v. F.M., 211 N.J. 420, 448 (2012).

> We afford particular deference "to factfindings of the family court because it has the superior ability to gauge the credibility of the witnesses who testify before it and because it possesses special expertise in matters related to the family."

This "'feel of the case' . . . can never be realized by a review of the cold record." Consequently, a family court's factual findings "should not be disturbed unless 'they are so wholly insupportable as to result in a denial of justice[.]'"

[C.W., supra, 435 N.J. Super. at 139-40 (citations omitted).]

A trial judge's legal conclusions are subject to plenary review. Id. at 140 (citing Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995)). We review a trial judge's evidentiary rulings for abuse of discretion. State v. J.A.C., 210 N.J. 281, 295 (2012). We also apply the abuse-of-discretion standard to a judge's decision to grant or deny a mistrial. State v. Smith, 224 N.J. 36, 47 (2016).

On this appeal, defendant presents the following points of argument for our consideration:

POINT I.

THE TRIAL COURT'S FINDING OF GROSS NEGLIGENCE AS TO K.G. WAS IN ERROR AND SHOULD BE GROUNDS FOR REVERSAL OF THE FINDING OF ABUSE AND NEGLECT AS TO K.G. UNDER N.J.S.A. 9:6-8.21(c)(4)(b).

    A.   THE TRIAL COURT'S ANALYSIS OF THE FACTS AS IS APPLIED TO THE LAW WAS IN ERROR.

    B.   THE TRIAL COURT'S RELIANCE UPON THE COURT'S DECISION IN D.C.P.P. V. E.D.O. WAS IN ERROR AND SHOULD BE GROUNDS FOR REVERSAL OF THE TRIAL COURT'S FINDING AS TO K.G.

C. THE TRIAL COURT ERRED IN CONSIDERING THE DDD DETERMINATION OF SUBSTANTIAL COGNITIVE IMPAIRMENT AND THE ECLC CLASSIFICATION OF [CARL] AS A BASIS OF A FINDING OF GROSS NEGLIGENCE AS TO K.G.

D. THE TRIAL COURT ERRED IN DISCOUNTING THE OPINION OF DEFENSE EXPERT, DR. LIDIA ABRAMS, PHD., AND IN FINDING GROSS NEGLIGENCE AS TO K.G. AND, SHOULD BE GROUNDS FOR REVERSAL AS TO K.G.

POINT II.

THE TRIAL COURT'S DETERMINATION THAT THE DIVISION MET ITS BURDEN OF PROOF BASED ON A GROSS NEGLIGENCE STANDARD, WHERE NO ACTUAL HARM, IMMINENT DANGER OR SUBSTANTIAL RISK OF HARM WAS ESTABLISHED, SHOULD BE THE BASIS OF REVERSAL AS TO K.G.

POINT III.

THE TRIAL COURT'S DENIAL OF THE MOTION FOR A MISTRIAL WAS IN ERROR AND THE TRIAL COURT'S DENIAL OF THE DEFENSE'S APPLICATION TO REOPEN CROSS EXAMINATION OF DCPP WORKER GARCIA WAS IN ERROR.

POINT IV.

THE TRIAL COURT ERRED IN NOT PERMIT[T]ING THE DEFENSE TO INTRODUCE CERTAIN TESTIMONY OF WITNESSES AS TO ALL THE DAY CARE RECORDS AND MEDICAL RECORDS OF THE MINOR CHILD AND OF [CARL].

POINT V.

K.G.'S NAME SHOULD BE ORDERED REMOVED FROM THE CENTRAL REGISTRY BECAUSE THE CONCLUSION OF NEGLECT IS NOT SUPPORTED BY THE EVIDENCE AND THE STIGMA WILL DISADVANTAGE HER.

We find no merit in any of those contentions. Defendant's appellate arguments rely heavily on her version of the facts, which the judge rejected. Having reviewed the record, we find no basis to disturb Judge Kenny's evaluation of witness credibility. Her findings of fact are supported by sufficient credible evidence and her decision is legally correct in light of those factual findings. See C.W., supra, 435 N.J. Super. at 139-40.

Turning to the central issue in the case, we find no reason to second-guess the judge's conclusion that defendant was grossly negligent in leaving the baby alone with Carl, who was cognitively impaired and unable to safely care for the child. Carl's incapacity was demonstrated through the testimony of multiple witnesses, including the assistant principal of his school, a DDD evaluator, his own trial testimony, and his conduct on the evening of June 12, 2013. It is clear from this record that leaving Valentine alone with Carl could have resulted in serious harm to the baby. The fact that Carl was able to care for the child under his mother's supervision did not mean that it was safe to leave Carl in sole charge of the baby for extended periods of time. Whether defendant's conduct resulted from extremely poor judgment or willful blindness to the danger is immaterial; her actions constituted child neglect

28

within the meaning of N.J.S.A. 9:6-8.21(c)(4)(b). E.D.-O., supra, 223 N.J. at 178-79.[7]

Moreover, this was neither an isolated lapse in parental judgment nor a one-time response to an emergency situation. Rather, based on defendant's own testimony and her statements to the Division, she made a practice of leaving Carl in sole charge of the child, while she shopped and ran other errands. That conduct constituted gross negligence because, as this record illustrates, Carl lacked the capacity to safely care for the baby without supervision.

None of the cases on which defendant relies are on point, because they involved understandable one-time mistakes, simple as opposed to gross negligence, or insufficient proof of risk to the child. See Dep't of Children & Families v. T.B., 207 N.J. 294 (2011); N.J. Div. of Youth & Family Servs. v. J.L., 410 N.J. Super. 159 (App. Div. 2009); A.L., supra, 213 N.J. at 8-9.

For example, in T.B., the court overturned a finding of child neglect against a mother who, on one occasion, "left her four-year-old child unsupervised for two hours under the mistaken belief that his grandmother was home." T.B., supra,

---

[7] The record strongly suggests that defendant was aware of Carl's significant limitations, which she sought to conceal from the Division during its May investigation. See N.J. Div. of Child Prot. & Permanency v. K.N.S., 441 N.J. Super. 392, 399 (App. Div. 2015).

207 N.J. at 296.  The Court acknowledged that "[t]here exists a continuum between actions that are grossly negligent and those that are merely negligent" and a "parent's conduct must be evaluated in context based on the risks posed by the situation." Id. at 309.

The Court considered that, while it was "a close case," the mother's conduct was not grossly negligent. "This is not a situation in which she left her four-year-old son at home alone knowing there was no adult supervision." Ibid.  Instead, based on longstanding arrangements with the grandmother, the mother believed that the grandmother was home in bed, because her car was parked outside, and therefore believed she could safely leave the child tucked in bed while she went out to dinner. However, unknown to the mother, the grandmother had unexpectedly left the house.  "What occurred on the date in question was totally out of the ordinary." Id. at 310.  The Court concluded that the defendant was negligent in not making absolutely sure that the grandmother was home, but she was not grossly negligent. Ibid.

Similarly, in J.L., a mother was negligent but not grossly negligent in allowing her young children to walk home from a playground near the family's home. J.L., supra, 410 N.J. Super. at 161.  She was able to see the children at all times on their

trip home, but when they entered the house, the door unexpectedly slammed shut without her knowledge. The children were frightened and the older child called 911. After considering the entire context of the incident, we concluded:

> [W]e are satisfied, in this case, that J.L.'s conduct, although arguably inattentive or even negligent, did not meet the requisite standard of willful or wanton misconduct. In this regard, we note that the children were almost four and almost six years of age, respectively. They were returning to a home that was within view of their mother, and they were not required to cross any streets to reach it. The home, itself, was deemed safe by [the Division], and with the exception of this incident, J.L.'s conduct toward her children was deemed appropriate.
>
> [J.L., supra, 410 N.J. Super. at 168.]

We also considered that the mother had trained her children to leave the door ajar if they walked home from the playground ahead of her, that the door had unexpectedly swung shut and locked on this occasion, and that the older child knew how to call 911 and had done so. "These circumstances suggest that the child exercised good judgment and was well trained by his parents to deal with the crisis that he perceived to exist." Id. at 169.

Most recently, in E.D.-O., the Court addressed a case where, on one occasion, a mother left her sleeping baby unattended in a car for about ten minutes while she shopped in a

nearby store. E.D.-O., supra, 223 N.J. at 169. The Court rejected the Division's application of "a categorical rule" that any parent who leaves a child unattended in a car must be found to have committed gross negligence under Title 9. Id. at 192-93. Rather, the Court held that the totality of the circumstances must be considered:

> Those circumstances include but are not limited to the actual distance between the vehicle and the store, [the mother's] ability to keep the vehicle in view, the length of time she left the child unattended, the number of vehicles and persons in the area, the ability to gain access to the interior of the car, and the temperature inside and outside the car.

> [Id. at 194.]

Based on our reading of the foregoing cases, we derive some principles appropriate to this case. We acknowledge that parents are called upon to make many judgment calls in raising their children, and deciding on a child care provider is one of them. Under the minimum degree of care standard, in evaluating a parent's decision that someone is capable of caring for a child in his or her absence, the age and abilities of the child are important factors, as are the age and abilities of the potential caretaker, considered with all other relevant circumstances. Whether there is an unacceptable risk of harm and whether the parent has been grossly negligent are fact sensitive issues that

must be resolved on a case by case basis, in light of the legally competent evidence.

In this case, defendant left a helpless infant in the care of Carl who, while he was a caring and loving brother, had the functional capacity of a seven-year-old and lacked sufficient mental capacity to safely care for the baby. There is a quantum difference between allowing a young child, or a person with a very limited mental capacity, to act as a mother's helper under supervision, and leaving that individual alone to care for a baby.

Unlike T.B., J.L., or E.D.-O., this was not an accidental or unusual circumstance. Defendant made a practice of leaving the baby alone with Carl. In this case, she left Carl in sole charge of the baby for an extended period of time. Further, unlike A.L., where the Division failed to prove the risk of harm to the child, here there was ample evidence to support Judge Kenny's finding that the baby was placed "in peril." See A.L., supra, 213 N.J. at 8-9.

Defendant contends that a finding of gross negligence is unwarranted, and her name should not be placed on the Central Registry pursuant to N.J.S.A. 9:6-8.11, because no actual harm befell the baby, and at the time of the fact-finding hearing he

was well cared for and in no danger. We cannot agree. As the Supreme Court recently held:

> We reject the interpretation of the definition of abuse and neglect, N.J.S.A. 9:6-8.21(c)(4)(b), advanced by the mother that the statute requires a finding that the parent's conduct presents an imminent risk of harm to the child at the time of fact-finding rather than at the time of the event that triggered the Division's intervention. Such an interpretation is not supported by the text of the statute, the legislative history, the Court's long-standing interpretation and application of the statute, or common sense.
>
> [E.D.-O., supra, 223 N.J. at 170.]

Defendant's remaining appellate arguments are without sufficient merit to warrant discussion beyond the following comments. R. 2:11-3(e)(1)(E). We find no abuse of discretion in the judge's evidentiary rulings and case management decisions. Defendant's mistrial motion was filed on the second day of the trial, by a newly-retained attorney who essentially wanted either a mistrial or a re-run of the first trial day. The judge appropriately denied the motion, for the reasons she stated on the record on February 6, 2014. Likewise, the judge thoroughly addressed defendant's evidentiary arguments, and based her decision on legally competent evidence.

Finally, we cannot agree with defendant's argument that her name should not be placed on the Central Registry because it may

harm her business interests:

> [W]hether a parent's or caretaker's conduct causes an imminent risk of harm is evaluated through the lens of the statutory standard as interpreted and applied by the Court, rather than through the lens of the consequences of a finding of neglect, specifically, enrollment in the Central Registry. Enrollment in the Registry is a consequence of a finding of abuse or neglect. N.J.S.A. 9:6-8.11.
>
> [E.D.-O., supra, 223 N.J. at 195.]

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION