# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1100-23

NEW JERSEY DIVISION OF
CHILD PROTECTION AND
PERMANENCY,

      Plaintiff-Respondent,

v.

A.O.,

      Defendant-Appellant,

and

E.M.O.,

      Defendant.

_____

IN THE MATTER OF
I.O., a minor.

_____

Submitted January 13, 2025 – Decided May 15, 2025

Before Judges Gummer, Berdote Byrne, and Jacobs.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Mercer County, Docket No. FN-11-0070-22.

Jennifer N. Sellitti, Public Defender, attorney for appellant (Laura M. Kalik, Designated Counsel, on the briefs).

Matthew J. Platkin, Attorney General, attorney for respondent (Janet Greenberg Cohen, Assistant Attorney General, of counsel; Renee Greenberg, Deputy Attorney General, on the brief).

Jennifer N. Sellitti, Public Defender, Law Guardian, attorney for minor (Meredith Alexis Pollock, Deputy Public Defender, of counsel; Noel C. Devlin, Assistant Deputy Public Defender, of counsel and on the brief).

PER CURIAM

Defendant A.O. ("Alice") is the biological mother of I.O. ("Isaac"), a three-year-old boy.[1] Alice appeals from an order entered by the Family Part finding she had abused or neglected Isaac within the meaning of N.J.S.A. 9:6-8.21(c)(4), for failing to accept her son's diagnosis of sickle cell disease or obtain required medical care and treatment for him. We affirm.

---

[1] We use initials and pseudonyms to refer to the parties and their family members to protect their privacy and preserve the confidentiality of these proceedings. R. 1:38-3(d)(12).

I.

Sickle Cell Diagnosis and Treatment

Alice gave birth to Isaac in September 2021, after separating from Isaac's father, E.O. ("Eddie"). Isaac's initial health screening indicated a possible diagnosis of sickle cell disease. He was also treated for jaundice caused by high levels of bilirubin.[2] The hospital advised Alice of the potential sickle cell diagnosis and referred Isaac to a specialist in pediatric hematology oncology. Just days after Isaac's birth, Alice missed two appointments at a treatment center to ensure that Isaac's bilirubin count was trending down. Because jaundice may cause brain damage if left untreated, on October 5, 2021, the medical staff at the treatment center contacted the Division of Child Protection and Permanency (the Division) leading to an initial report of possible neglect.

The Division conducted an interview with Alice and learned she did not want to take Isaac to the jaundice follow-up appointment because the facility was "out of network." Instead, she had made an appointment with another provider. The Division reported that the "pediatric collateral received on

---

[2] Bilirubin is "a reddish-yellow bile pigment produced during the breakdown of hemoglobin in red blood cells. It is a normal byproduct that the liver processes, but excessive bilirubin buildup in the blood can lead to jaundice, a yellowing of the skin and eyes." Merriam-Webster's Collegiate Dictionary 121 (11th ed. 2020).

A-1100-23

10/14/2021 indicate[d] [the] child was seen for a recheck/sick visit. No concerns indicated." The Division concluded the report of neglect was unfounded "as there is not a preponderance of the evidence [Isaac] was neglected as defined and the evidence indicates the child was not harmed."

In November 2021, Alice brought Isaac to see a recommended doctor at the Rutgers Cancer Institute of New Jersey (CINJ), where the doctor confirmed the sickle cell diagnosis. He prescribed a course of penicillin.

Pursuant to a treatment plan, Alice brought Isaac to see the doctor again on December 21, 2021. In his progress notes from that visit, the doctor stated he had telephoned Alice to advise her that he had confirmed Isaac's diagnosis of the sickle cell disease, but at the December in-person appointment she claimed to have no memory of that conversation. The doctor later testified that Alice did not accept the medical diagnosis, describing her as "very disbelieving" as she "claimed it was impossible that the child had sickle cell disease" because she was not a carrier of the sickle cell gene trait. The doctor also testified that Alice disclosed to him she had not administered the previously prescribed penicillin to Isaac because no one told her the prescription was ready for pickup.

In April 2022, the Division was contacted by medical staff at CINJ, who reported that Alice had missed four appointments scheduled to take place on

various dates in January, March, and April of 2022. CINJ staff also reported that Alice had been unreachable for over five weeks by phone. A Division caseworker investigated and reported that Alice had "stated that her son didn't have sickle cell and didn't need to take medications or see any specialist." The caseworker further reported that Alice denied she had any mental health issues.

On April 27, 2022, the caseworker spoke with Isaac's maternal grandmother, who advised the caseworker she understood the severity of Isaac's condition and assured her that Isaac would be brought to CINJ for his next scheduled appointment. At Isaac's May 3, 2022 appointment at CINJ, Alice informed the doctor she would not be returning with Isaac because he did not have sickle cell disease, nor would she be administering any medication. The doctor described Alice as "argumentative" and "uncooperative" during the appointment. He testified that Alice did not engage with medical staff to learn how to test Isaac's spleen for distress. In addition, Isaac's blood count had worsened, and he was prescribed a second medication, hydroxyurea. A follow-up appointment was scheduled for June 7, 2022.

The caseworker and a Division nurse visited Alice and Isaac twice in May 2022. Alice continued to deny the diagnosis and refuse treatment for Isaac. Alice was unable to confirm when Isaac had last visited the pediatrician and

acknowledged Isaac was behind on his immunizations. Although Isaac's grandmother had picked up the penicillin prescription from the pharmacy, the caseworker questioned whether it was being given to Isaac because Alice could not articulate how it was being administered.

On May 24, 2022, the Division confirmed with CINJ medical staff that Isaac was last seen on February 24, 2022, and had missed a scheduled March appointment, with no further appointments scheduled. Isaac's immunizations were also not up to date. His doctor testified the failure to keep Isaac's immunizations up to date was problematic because Isaac had a compromised immune system. The doctor also testified that children with sickle cell disease receive additional vaccinations and operate on an accelerated vaccination schedule due to their vulnerability.

A Division nurse and caseworker met with Alice and Isaac on May 24, 2022. They found Alice still had not accepted the sickle cell diagnosis. The caseworker reported that Alice had stated "bloodwork will show . . . her son does not have it . . . things will change, and she doesn't believe that her child has the disease . . . She kept saying, 'My faith will not allow him to have it.'" The nurse and caseworker were concerned that Isaac was not being given his

6

medication. The doctor testified that without "penicillin, there's a very high risk of death secondary to sepsis."

Alice missed Isaac's June 7, 2022 appointment at CINJ. On June 16, 2022, the Division removed Isaac from Alice's home pursuant to an emergency Dodd order.[3] The caseworker who had participated in the removal described Isaac as being "very . . . very pale, his skin was kind of grayish in tone. He was kind of like a rag doll. He was very limp, wasn't eating."

Isaac was placed in an unrelated resource home. During his first night at the resource home, the resource parents called the caseworker concerned about Isaac's condition. The caseworker testified "[Isaac] was hard to wake up when he was placed at the resource home . . . . Sleeping for extended periods of time . . . and then at that point we directed the resource parent to take the child to the emergency room."

The resource parents took Isaac to the hospital where they were advised he needed an immediate blood transfusion. Even after a physician from the hospital spoke with Alice about the urgency and importance of the blood transfusion, she refused to give consent and responded, "[my] child doesn't need

---

[3] A "Dodd removal" refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, N.J.S.A. 9:6-8.21 to -8.82.

a transfusion. I'm holding out hope that he will get better through . . . time."

The Division received emergency approval from the Office of the Attorney General to consent to the transfusion on Isaac's behalf. Thereafter, the Division reached an investigatory finding that medical neglect was "established" based on Alice's failure to meet Isaac's medical needs. Subsequently, Isaac was moved from the unrelated resource home and placed with his maternal uncle.

Fact-Finding and Disposition

The trial court held a fact-finding hearing on two days, October 27, 2022 and January 23, 2023 Alice attended on the first day but not the second day. Alice's counsel did not object to the continuation of the fact-finding hearing in her absence.

The Division presented two witnesses, a Division caseworker and Issac's treating physician, Dr. Richard Drachtman, who was qualified by the court as an expert in the field of pediatric hematology. The doctor explained that children with the sickle cell trait are at risk for sepsis and splenic sequestration, which causes shock from bleeding in the spleen. Without treatment, a child with manifested disease has an eighty percent chance of dying before age twenty and of those, seventy-five percent die before they turn five due to causes such as splenic sequestration, sepsis infection, and stroke. With treatment, "the vast

A-1100-23

majority of people survive into adulthood. It's way over 90 percent." He testified that the failure to treat sickle cell disease is "catastrophic" and the "uncontroverted data" supports that the failure to treat is "life-threatening."

Finally, the doctor testified that during his career, although he has encountered parents who refused certain medical treatments or interventions for religious reasons, no one had ever objected to a sickle cell diagnosis on the basis of religion.

On March 22, 2023, the court placed its decision on the record and issued an order in which it found Alice had abused or neglected Isaac in that she had "refused to acknowledge and seek medical treatment for [his] sickle cell anemia, which put [him] at a high risk of harm including death . . . ."

The court found the doctor's expert testimony "credible," "compelling," and "impactful." In particular, the court found uncontroverted the doctor's testimony that without treatment, Isaac's sickle cell disease would have an eighty percent chance of lethality before the age of twenty. Further, the court recognized that while it had "receive[d] correspondence from counsel advising that [Alice] was hospitalized," the evidence presented at the fact-finding hearing showed that Alice "d[id] not have any . . . mental health issue[s]."

9

The court found that Alice had missed a total of seven doctor's appointments for Isaac and had fallen behind with Isaac's immunizations. The court concluded that Alice "understood the severity of [Isaac's] diagnosis" and "repeatedly failed to seek medical care and treatment related to sickle cell disease," which placed him in danger of "severe medical complications, up to including death." It found that Alice's lack of acceptance of the sickle cell disease diagnosis and subsequent treatment plan put Isaac's health at imminent risk.

In consideration of these findings, the court concluded:

> So here, the uncontroverted evidence . . . demonstrates [Alice] was aware of, educated on, and provided resources to address her son's diagnosis of [s]ickle [c]ell [d]isease, that she understood the severity of the diagnosis but refused to acknowledge or accept it, she . . . repeatedly failed to seek medical care and treatment related to [s]ickle [c]ell [d]isease . . . and that the failure to meet [Isaac's] medical needs (indiscernible) continually . . . places him (indiscernible) severe medical complications, up to including death.
>
> And . . . these facts support my finding that [Isaac] is an abused and neglected child . . . pursuant to N.J.S.A. 9:6-8.21, and requires continued jurisdiction and protection of the [c]ourt.

On October 12, 2023, the court entered an order terminating the litigation because Isaac was living with his father and "conditions have been remediated."

10

The court directed that Eddie would continue to have physical custody of Isaac and both parents would have legal custody.

In its decision, the court expressly found that Alice had not asserted a religious exception to treatment for Isaac. The court remarked the only comment that could be attributed to a religious objection to medical treatment was when Alice reportedly told the caseworker that Isaac's bloodwork would show her son did not have sickle cell because, "[m]y faith will not allow him to have it." The court concluded that neither that comment nor Alice's subsequent inaction amounted to an objection to treatment on the basis of religious belief.

On appeal, Alice argues the trial court's finding that she willfully and wantonly withheld medical care from her infant son was not supported by the "preponderance of adequate, substantial, credible evidence." She asks this court to reverse the trial court's order finding she had "abused and neglected" Isaac by failing to seek medical care and treatment for his sickle cell disease for three reasons: (1) she did not shun all medical intervention for Isaac and there was no proof of imminent risk of harm; (2) Alice's decisions for Isaac's treatment and care were influenced by disparate cultural norms that caused her to be "initially resistant to adopting therapies that had become the norm in the

A-1100-23

treatment of sickle cell disease;" and (3) the court did not consider facts surrounding Alice's mental health challenges.

Isaac's Law Guardian and the Division urge this court to affirm, citing the unrebutted testimony of the Division's expert, Isaac's treating doctor. Additionally, the Law Guardian and Division observe that Alice did not establish she was suffering from an identified mental health condition or a mental health condition that prevented her from caring for her newborn son. Finally, both entities agree that Alice, for the first time on appeal, asks this court to address the trial court's purportedly insufficient consideration of her religious and cultural differences.

## II.

An appellate court will uphold a trial judge's fact-findings if they are "supported by adequate, substantial, and credible evidence." N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2015); see also N.J. Div. of Youth & Fam. Servs. v. S.I., 437 N.J. Super. 142, 152 (App. Div. 2014) ("Our standard of review on appeal is narrow."). "This deferential standard of review is appropriate because the Family Part judges are presumed to have a 'specialized knowledge and experience in matters involving parental relationships and the best interests of children.'" N.J. Div. of Child Prot. & Permanency v. S.K., 456

N.J. Super. 245, 261 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 420, 472 (2012)).  However, "[w]here the issue to be decided is an 'alleged error in the trial judge's evaluation of the underlying facts and the implications to be drawn therefrom,'" the scope of review is broader. N.J. Div. of Child Prot. & Permanency v. B.H., 460 N.J. Super. 212, 218 (App. Div. 2019) (quoting N.J. Div. of Youth & Fam. Servs. v. G.L., 191 N.J. 596, 605 (2007)).  The court's legal conclusions are reviewed de novo.  See ibid. (citing N.J. Div. of Child Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div. 2016)).  A finding that a party was negligent is a legal conclusion and therefore is not entitled to any deference.  See N.J. Div. of Youth & Fam. Servs. v. T.B., 207 N.J. 294, 308 (2011).

The purpose of Title Nine is clear:  "to protect children 'who have had serious injury inflicted upon them' and make sure they are 'immediately safeguarded from further injury and possible death.'"  Ibid. (quoting N.J.S.A. 9:6–8.8(a)).  Although Title Nine provides for the civil prosecution of an abusive or neglectful parent, its "'paramount concern' is the 'safety' of children and its 'primary consideration' is a child's 'best interests.'"  Id. at 369 (quoting N.J.S.A. 9:6-8.8(a)).  Intent to injure the child is irrelevant.  See N.J. Div. of Youth &

13

Family Servs. v. P.W.R., 205 N.J. 17, 32 (2011) ("[I]njuries caused accidentally can form the basis for a finding of neglect.").

Procedural protections are nonetheless afforded to the parents. Id. at 369. In particular, parents have the right to a fact-finding hearing, N.J.S.A. 9:6-8.50(d), with the Division having to prove its case by the preponderance of competent, material, and relevant evidence. N.J.S.A. 9:6-8.46(b). "The purpose of a fact-finding hearing in an abuse or neglect proceeding is not to assign guilt to a defendant, but to determine whether a child is an abused or neglected child pursuant to N.J.S.A. 9:6-8.44." N.J. Div. of Youth & Fam. Servs. v. V.T., 423 N.J. Super. 320, 328 (App. Div. 2011) (citing N.J. Div. of Youth & Fam. Servs. v. I.H.C., 415 N.J. Super. 551, 581-82 (App. Div. 2010)). Accordingly, the Division bears the burden of proof to demonstrate by a preponderance of the evidence at the fact-finding hearing that there was an act of abuse or neglect committed by the parent charged with a legal duty of care for the minor child. See N.J. Div. of Child Protection and Permancy v. J.R.-R., 248 N.J. 353, 376 (2021) (citing N.J.S.A. 9:6-8.46) ("The preponderance of the evidence standard is the least difficult standard of proof to vault.").

N.J.S.A. 9:6-8.21(c)(4) defines an abused or neglected child as:

> a child whose physical, mental, or emotional condition has been impaired or is in imminent danger of

A-1100-23

becoming impaired as the result of the failure of his parent or guardian, as herein defined, to exercise a minimum degree of care (a) in supplying the child with adequate food, clothing, shelter, education, medical or surgical care though financially able to do so or though offered financial or other reasonable means to do so . . . .

Recently, the Court has defined the standard for ascertaining whether a child is in "imminent danger" as follows:

> Per their plain meanings, "imminent" means "threatening to occur immediately; dangerously impending . . . [or] about to take place," Black's Law Dictionary 898 (11th ed. 2019), and "danger" means "peril; exposure to harm, loss, pain, or other negative result," id. at 493. Further, Black's Law Dictionary defines "imminently dangerous" as "reasonably certain to place life and limb in peril." Id. at 494.
>
> [N.J. Div. of Child. Prot. & Permanency v. B.P., 257 N.J. 361, 376 (2024).]

Pursuant to the second element of N.J.S.A. 9:6-8.21(c)(4), a parent is expected to exercise "a minimum degree of care," which means, "conduct that is grossly or wantonly negligent, but not necessarily intentional." G.S. v. Dep't of Hum. Servs., Div. of Youth & Fam. Servs., 157 N.J. 161, 178 (1999); B.P., 257 N.J. at 376 (holding that ordinary negligence is insufficient). In this regard, both action and inaction by a parent can constitute abuse or neglect. See J.R.-R., 248 N.J. at 370. "Conduct is considered willful or wanton if done with the

15

knowledge that injury is likely to, or probably will, result." G.S., 157 N.J. at 178 (citing McLaughlin v. Rova Farms, Inc., 56 N.J. 288, 305 (1970)); see Krauth v. Geller, 31 N.J. 270, 277 (1960) (holding that wantonness "is an advanced degree of negligent misconduct"). This includes "actions taken with reckless disregard for the consequences." G.S., 157 N.J. at 178. "Whether a parent or guardian has failed to exercise a minimum degree of care is to be analyzed in light of the dangers and risks associated with the situation." Id. at 181-82. Thus, the analysis is fact sensitive, considered on a case-by-case basis. See B.P., 257 N.J. at 376; see also S.I., 437 N.J. Super. at 153.

At the outset, we note that while cultural and religious beliefs were explored by the court at the Title Nine hearing, defenses asserted on appeal related to these issues were not affirmatively raised below. Beyond this, we share the Division and Law Guardian's assessment that defendant's religious and cultural differences were undefined and unsupported by the record. Finally, we have recognized that

> [w]hen children are removed from parents under Title 9, the Division is charged with the duty to provide appropriate medical care and treatment. We view this duty as encompassing the authority to administer age-appropriate immunizations over the religious objections of the parents. To rule otherwise would needlessly jeopardize the health and safety of children in placement and undermine the discharge of the

16

Division's duty to provide care, particularly when a known risk of exposure to a disease preventable by vaccination is present.

[N.J. Div. of Child Prot. & Permanency v. J.B., 459 N.J. Super. 442, 457 (App. Div. 2019) (citations omitted).]

Alice principally relies on three medical neglect cases in support of her appeal, all of which are factually inapposite and unpersuasive. The first, G.S., 157 N.J. at 182-83, involved a professional health-care worker accidentally and unwittingly overdosed a mentally-impaired child. The Court found she acted "foolishly" and failed to exercise a minimum degree of care. The second, P.W.R., 205 N.J. at 37-38, involved a parent who failed to take a healthy teenager to the pediatrician for two years. The Court held that conduct did not rise to the level of medical neglect. The third, S.I., 437 N.J. Super. at 154-57, involved a grandparent who failed to send a suicidal child in her custody for a psychiatric evaluation. But the Division failed to proffer any evidence of a threat of imminent danger, and the trial court did not find abuse or neglect. None of these matters are apposite as they do not rise to the level of inaction by a parent coupled with the seriousness of the risk of death Isaac faced.

Alice also challenges the trial court's finding that Isaac was in "imminent" danger. She points to a statement by his treating doctor that sickle cell infants are typically protected from crisis for the first six to eight months of life.

17

However, we note that Isaac was removed from Alice's care when he was nearly nine months old, clearly outside of that protective time. She further minimizes the seriousness of Isaac's immediate hospitalization and blood transfusion after the Dodd removal by arguing that "visits to a hospital emergency room are fairly routine and expected." While all parties agreed that a child stricken with sickle cell disease inevitably will visit the hospital for care from time to time, Alice presented no explanation for why Isaac needed significant emergency medical treatment only hours after being removed from her care. His treating physician testified about the life-threatening dangers Isaac, as a child with sickle cell disease, faced without treatment and immunization. The court's finding that Isaac's health was placed in imminent danger of becoming impaired through Alice's inaction was supported by substantial credible evidence in the record.

Last, Alice's hospitalization for mental health treatment was not revealed until the disposition hearing, two months following the fact-finding hearing. As noted by the court, there was no evidence in the record that established or identified Alice's compromised mental health condition. Absent any such evidence, the court did not err in not considering facts surrounding Alice's mental health challenges.

A-1100-23

In summary, there was ample evidence in the record on which the court based its factual findings. The trial court's conclusion that Alice abused or neglected Isaac is supported by competent, credible evidence and is in accord with the controlling legal principles.

Plaintiff's remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is
a true copy of the original on file in
my office.

M.C. Harley

Clerk of the Appellate Division

A-1100-23