**RECORD IMPOUNDED**

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-2772-19
                    A-2773-19

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

J.G. and L.R.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF N.R.,
minor.

_____

        Argued April 14, 2021 – Decided July 6, 2021

        Before Judges Ostrer, Accurso and Enright.

        On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Hudson County, Docket No. FG-09-0101-20.

        Anastasia P. Winslow, Designated Counsel, argued the cause for appellant J.G. (Joseph E. Krakora, Public

Defender, attorney; Anastasia P. Winslow, on the briefs).

Robert W. Ratish, Designated Counsel, argued the cause for appellant L.R. (Joseph E. Krakora, Public Defender, attorney; Robert W. Ratish, on the briefs).

Salima E. Burke, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa H. Raksa, Assistant Attorney General, of counsel; Salima E. Burke, on the brief).

David Valentin, Assistant Deputy Public Defender, argued the cause for minor (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Meredith Alexis Pollock, Deputy Public Defender, of counsel; David Valentin, on the brief).

PER CURIAM

In these consolidated cases, defendants J.G. (Jill) and L.R. (Lewis) appeal from a February 21, 2020 guardianship judgment terminating their parental rights to their biological son, N.R. (Neil),[1] as well as from an earlier order arising out of a best interests hearing that Neil be placed with his resource parents in the event defendants' parental rights were terminated. Having reviewed the record in light of defendants' arguments, we conclude the trial judge correctly

---

[1] Pseudonyms and initials are used to protect the identity of the parties, minors and other individuals referenced in this appeal. R. 1:38-3(d)(12)

2

A-2772-19

applied the governing legal principles, and his findings are amply supported by competent credible evidence. Therefore, we affirm.

I.

Neil was born prematurely in April 2018. He suffered from significant health issues, including anemia, sepsis, fetal hydrops, and bilateral profound sensory neural hearing loss, causing him to spend several weeks in the hospital. When he was discharged in May 2018, the Division of Child Placement and Permanency initiated a Dodd removal[2] and placed Neil with non-relative resource parents, M.M. (Mark Mason) and A.M. (Ann Mason). He remained in the Masons' home throughout these proceedings.

Defendants have a history with the Division predating Neil's birth. Jill has two sons, E.G. (Ed) and J.C. (Jim), from prior relationships and another son, S.R. (Sam) with Lewis. In 2011, Ed and Jim were placed with a maternal relative who, in 2014, was granted kinship legal guardianship (KLG) of the boys under the Kinship Legal Guardian Act, N.J.S.A. 3B:12A-1 to -7. In 2018,

---

[2] A "Dodd removal" refers to the emergency removal of a child from the home without a court order, pursuant to the Dodd Act, which, as amended, is found at N.J.S.A. 9:6-8.21 to -8.82.

A-2772-19

defendants surrendered their parental rights to Sam to a non-relative caregiver who adopted him.

Given their lengthy involvement with the Division and the commencement of this case, defendants submitted to multiple court-ordered psychological, substance abuse and bonding evaluations. Additionally, the Masons and defendants' family friends, M.P. (Meg Pratt) and T.P. (Tom Pratt),[3] underwent bonding evaluations per court order. The results of these evaluations factored into the trial court's placement and guardianship decisions, so we highlight some conclusions and comments from the evaluators to provide context for our decision.

---

[3] Throughout this litigation, defendants referred to the Pratts as "their family." Also, Jill's brief states the Pratt family had "long-held ties with Jill's family and were considered kin and relatives." However, the Division acknowledged during the best interests hearing the Pratts were not "blood relatives" and the trial court's oral opinion of December 18, 2019 included the finding the Pratts were "not [defendants'] relatives." Further, the record reflects one of Jill's aunts knew Tom as a family friend for years, Tom knew Jill when she was a girl, before she had children, and Jill advised one of her aunts was a life partner with someone in the Pratt family. Additionally, Tom met Lewis after visits started through the Division, and Meg met Jill through the Division. Defendants did not provide the Pratts' names to the Division; instead, when one of Jill's maternal aunts was being explored for possible placement and she declined due to a health issue, she offered the names of the Pratts as family friends interested in caring for Neil.

A-2772-19

During a 2017 psychological evaluation, Jill disclosed she was raised by her maternal aunt after her parents died. She also divulged she started receiving Supplemental Security Income disability benefits in 2009, never held a job, and began abusing phencyclidine (PCP) when she was sixteen years old. Testing during the evaluation revealed Jill's estimated full-scale IQ was sixty-three, placing her below ninety-nine percent of the general population and in the intellectually deficient range.

When Lewis was psychologically evaluated in 2016 and 2017, he achieved a full-scale IQ score of fifty-five, the lowest possible score on that test. Because Lewis exhibited confusion during his 2017 evaluation, his evaluator opined "[e]ventually, it might . . . be worthwhile for [Lewis] to have a neurological evaluation to see if there are neurological sources of his confusion."

In the spring of 2018, due to ongoing litigation regarding Sam's placement, the Division referred defendants to Karen D. Wells, Psy.D. for updated psychological evaluations. Dr. Wells concluded that although Jill would not deliberately harm Sam, her "cognitive limitations, coupled with the potential for relapse to PCP pose severe and grave risks to her son's well-being." Once Neil was removed from defendants' care, Dr. Wells supplemented her report to address his circumstances. She opined he would "require not only

someone to be available to attend to [his medical] appointments, but also to understand the information being presented by the various doctors providing treatment, as well as follow-up with the services, medications, and scheduling of additional appointments." She found Jill "lack[ed] the wherewithal to independently function in this regard."

When Dr. Wells evaluated Lewis, she noted he was abusing drugs by age thirteen, had a significant juvenile history, and was hit in the head with a metal bat as an adolescent. She concluded he did "not possess the emotional, psychological, or cognitive capacity to assume a parenting role" for Sam and that his "marked intellectual deficits [were] unlikely to change." Her evaluation included Lewis's expressed beliefs there was one hour in a day and 365 weeks in a year. Dr. Wells ultimately recommended against defendants' reunification with Sam, and they subsequently surrendered their rights to the child.

## II.

In August 2018, Meg Pratt met with a Division worker to inquire how she and her husband could become Neil's custodians. A Division worker introduced Meg to Jill at the meeting, as the two had not met previously. Thereafter, and until the best interests hearing concluded on December 18, 2019, the Division and defendants supported Neil's placement with the Pratts in the event

6

defendants' parental rights were terminated. The Law Guardian consistently objected to this plan, instead favoring Neil's placement with the Masons.

Starting in August 2018, the trial court permitted the Pratts to attend defendants' supervised visits with Neil. Three months later, based on the Pratts' request to have Neil placed with them, and considering their New York residency, the trial court ordered an expedited assessment to be conducted through the Interstate Compact on the Placement of Children. It took over a year for the assessment to be completed and the Pratts to be approved as a placement option. In the interim, they became licensed as resource parents.

### III.

Neil received cochlear implants in separate surgeries in May 2019. That month, Meg notified the Division she had not yet taken sign language lessons to communicate with Neil because she had "faith [he was] going to hear." Tom advised he was willing to take sign language classes but had educated himself about sign language and could fingerspell Neil's name. By this time, Ann had been teaching Neil sign language for several months. She and her husband also received training from Neil's audiologist, Nicole Raia, Sc.D., regarding the maintenance and basic functions of Neil's devices, as well as how to progressively program his processors.

A-2772-19

Once the Pratts became licensed, the Division proposed placing Neil with them. It also moved to allow the Pratts overnight visits with Neil. The Law Guardian opposed the Division's requests and asked for a best interests hearing to address Neil's placement. In May 2019, the judge denied the Pratts overnight visits and approved the Division's plan of termination of parental rights, followed by adoption "by an individual who will be determined after the best interest hearing." In anticipation of that hearing, the judge ordered the Pratts and Masons to submit to bonding evaluations that month with Robert James Miller, II, Ph.D.; also, the judge scheduled the best interests hearing for a date in August 2019.

Dr. Miller issued his comparative bonding evaluations for the Masons and the Pratts in June 2019. The doctor determined Neil was emotionally constrained during his evaluation with the Pratts, was not emotionally attached or bonded with them, and they did not respond to his behavioral cues. Also, Dr. Miller concluded Neil would not experience a negative reaction if his relationship with the Pratts discontinued. Conversely, Dr. Miller determined the Masons followed Neil's cues for play, responded to his needs, and used sign language with him so that Neil increased his vocalization around them. He opined Neil had a secure attachment to the Masons and if this relationship was

severed, Neil would experience it as a "catastrophic loss," triggering "immediate and enduring harm to his psychological and emotional development." The doctor added, "[s]eparation would result in incomprehensible loss for [Neil], would undermine his apparent progress, and undermine the needed supports in place to help [Neil] overcome significant and enduring developmental challenges since birth . . . . [T]here appears no psychologically valid need or reason to change the placement arrangement."

Dr. Wells again evaluated Jill and Lewis in May and July 2019, respectively. By then, defendants had been evicted for nonpayment of rent and were homeless. Jill reported she and Lewis slept on the PATH train or at the Hoboken terminal.[4] Similar to her evaluation in 2018, Dr. Wells opined Jill did

> not possess the cognitive capacity or wherewithal to consistently and independently attend to [Neil's] day-to-day needs. While it is believed . . . she loves [Neil] and would make every effort to provide for his best care, it is opined that even at her best, [Jill] lacks the capacity to fully address [Neil's] needs.

Dr. Wells also expressed concern about Jill's chronic addiction to PCP, concluding it would adversely impact her ability to care for Neil. Additionally,

---

[4] According to the Division, it subsequently assisted defendants in securing documentation so they could move to a shelter. They still lived at a shelter by the time the guardianship trial concluded.

Dr. Wells stated that "[c]onsistent with conclusions . . . from prior evaluations, . . . [Lewis] does not possess the emotional, psychological, or cognitive capacity to assume a parenting role. Limited in his ability to care for himself, [Lewis] does not have the ability to independently attend to the needs of a child." Dr. Wells recommended defendants' parental rights to Neil be terminated.

Dr. Wells also conducted bonding evaluations for defendants, the Masons and the Pratts in July 2019. Following defendants' bonding evaluation, Dr. Wells concluded:

> Although [defendants] were observed to relate in a loving and positive manner with [Neil], clinical support cannot be given for them to assume care for him . . . . They are not stable in their own functioning, continue to engage in illicit drug use, and by their own report recognize that they are not capable of attending to [Neil's] needs at this time . . . . [Defendants'] ability to accurately, appropriately, consistently and independently respond to [Neil's] needs is lacking, with such increasingly highlighted given [his] audiological needs. (Emphasis added).

During the Masons' bonding evaluation, they advised Dr. Wells they would "love to adopt" Neil. Additionally, Ann informed Dr. Wells that because Neil required several daily medical appointments when he was initially placed in her home, she took an extended leave of absence from work for three months. She further disclosed she taught Neil sign language, and arranged to have a doll

10

custom made for him so the doll wore cochlear implants. Dr. Wells determined Neil trusted the Masons to be "reliable, trustworthy and accessible parental figures," and if he remained in their care, it was "without question," he would "continue to thrive."

When Dr. Wells assessed the Pratts, Meg reported she and her husband remained interested in assuming custody of Neil, and that Tom was learning sign language. She added, "if I have to go, I'll go, too." Dr. Wells asked Tom how he was "doing with . . . sign language," and he responded, "I was getting real good at it, but then I kind of slacked off." Dr. Wells concluded Neil was comfortable with the Pratts but did not relate to them as parental figures. Based on her assumption defendants would be unable to care for Neil in the foreseeable future, Dr. Wells favorably viewed Neil's placement with the Pratts. She acknowledged Neil might experience "acute distress, confusion and mild regression" if he transitioned to the Pratts' home, but she determined they could mitigate that harm. Dr. Wells opined Neil's "<u>placement must be with a guardian that is willing to spend at least one hour every evening dedicated to expanding spoken language or dedicated to learning fluent American Sign Language</u> . . . for him to use [t]otal [c]ommunication." (Emphasis added). Understanding the Pratts "had not been given the opportunity or responsibility to independently

care for" Neil, Dr. Wells nonetheless concluded Neil's "short and long-term [b]est [i]nterest needs can best be met by" the Pratts.

Prior to the best interests hearing scheduled for August 2019, defendants requested a postponement to enable them to secure bonding evaluations with their experts. The judge rescheduled the hearing to October 1, 2019 and notified all parties at that time that Neil's audiologist would be testifying at the hearing.[5] Additionally, in August 2019, at the Law Guardian's request, Dr. Miller issued a report concerning the Division's request that Neil start overnight visits with the Pratts. The doctor recommended against overnight visits, stating, "[s]eparating [Neil] from his current home, bedroom/toys, and important nighttime routines with the adults who, from his perspective are his (psychological) parents, will most probably result in increasing confusion and frightening separation anxiety." The trial court subsequently denied the visitation request without prejudice, stating, in part:

> The court is not inclined to grant overnight visitation to [the Pratts] until . . . they have demonstrated they have a full working understanding of [Neil's] remaining medical issues that they would need to deal with when the child is in their home overnight. The court notes that in the Division's report, Dr. Wells recommends [the

---

[5] The judge issued another order in September 2019, confirming Drs. Wells and Miller also would testify at the best interests hearing.

Pratts] learn about the "cochlear implants, process[ors], and battery requirements, daily activities, feeding times, and nighttime routine[]" of the child.

Shortly after the best interests hearing was adjourned, Dr. Wells updated her position regarding Neil's placement. She stated she was "no longer able to clinically support that [Neil] would be removed from his current resource home to be placed with [the Pratts]." She found it concerning Meg had not attended scheduled appointments to complete bonding evaluations arranged by defendants' attorneys and had not consistently attended Saturday visits with Neil. Dr. Wells also was troubled neither one of the Pratts attended a critical appointment with Dr. Raia in August 2019 "to receive training and information regarding [Neil's] progress and needs."

In late September 2019, Lewis tested positive for PCP and the Division reported he had not complied with a substance abuse evaluation or treatment. At that point, defendants again asked the court for time to obtain updated bonding evaluations with their experts, citing "unexpected work emergencies on the part of [Meg] that caused her not [to be] able to attend the selected dates . . . put forth by the experts." The Division supported the adjournment request, but the Law Guardian objected, arguing defendants had "ample opportunity to conduct these bonding evaluations." The Law Guardian contended the best

A-2772-19

interests hearing previously was adjourned to allow defendants to coordinate the Pratts' bonding evaluations, the hearing was due to commence within a matter of days, her bonding expert was prepared to testify, and the timing of defendants' request was highly prejudicial to Neil. The judge denied defendants' adjournment request, explaining Neil had been in placement since the spring of 2018, the parties were told in May 2019 about the upcoming best interests hearing, and he was being asked "[o]n the eve of the hearing . . . for additional time." He stated he would not "delay this child's permanency any further." Also, as this hearing occurred two days after Dr. Wells withdrew her support for Neil's placement with the Pratts, the judge stated he had no evidence "from any expert . . . at this time" to suggest the Pratts would be an "appropriate placement." He concluded, "[t]o adjourn this case to give [Meg] the opportunity to show up to this appointment when she had that for the last four months, doesn't make sense to me." Likewise, the judge denied defendants' request to initiate overnight visits between Neil and the Pratts, finding he did not have "any proffer of any single expert that says that this is a good idea." Significantly, the judge clarified he was "just ruling on . . . a motion to delay this trial," that "no report . . . exists to serve late," and he would consider an application to serve a late expert report if one was secured.

14

IV.

The best interests hearing commenced on October 1, 2019 and concluded over two months later. During the nine-day proceeding, over a dozen witnesses testified, including the Masons, the Pratts, the Division's adoption specialist, Kevin Roleson, and Drs. Wells, Raia and Miller.

On the first day of trial, Dr. Raia testified about the importance of Neil having "total communication" abilities, which she described as using "hearing, spoken language, and American Sign Language." Further, she emphasized the importance of a parent applying early intervention therapy techniques on a daily basis, stating "children who don't get early intervention or get inconsistent early intervention really don't develop good speech and language. It's really the foundation for all other learning." She added, "[t]he parent has to take every moment of their day to expand upon language."

Following Dr. Miller's testimony at the end of October, counsel for each defendant informally requested permission to proceed with a bonding evaluation between the Pratts and Neil. The judge reminded counsel they knew of the best interests hearing "way in advance," that their applications could possibly delay the hearing, and they should have filed formal motions in support of their requests. The judge further remarked it would be unfair to Neil to permit the

15

defense to secure bonding evaluations after Dr. Miller testified. Once defendants renewed their request for the Pratts' bonding evaluation via formal motions, the judge denied their applications, finding it would be "fundamentally unfair" to Neil to permit bonding evaluations at that juncture.

Prior to the conclusion of the best interests hearing, defendants moved to have the Pratts submit to bonding evaluations in anticipation of the guardianship trial. The judge also denied these requests, stating, "I'm not going to allow any evaluations of the [Pratts] at this time, subject to the ruling in this case." Similarly, when the judge was repeatedly asked by the Division during the course of the best interests hearing to allow the Pratts increased and overnight visits, he consistently declined to alter the status quo. At one point in the proceeding, he found the application "was not supported by the evidence thus far." He also determined expanding visits at that time could impact Neil's ability to speak and "have language" in his life.

When the Division called Dr. Wells to testify, she acknowledged she had recently withdrawn her support for placing Neil with the Pratts. Dr. Wells confirmed she was informed the Pratts purportedly were unaware of Dr. Raia's August 2019 appointment with Neil and were exercising visitation, so she renewed her support for Neil's placement with the Pratts. She concluded they

16

possessed "the cognitive capacity, the commitment, and the wherewithal to attend to [Neil's] needs." Further, she reiterated her position that Neil's transition to the Pratts home would cause him only temporary harm, which the Pratts could mitigate.

Approximately two weeks before the hearing concluded, the Division proffered an opinion by an expert audiologist and moved to add the expert, as well as two fact witnesses to its witness list. The judge precluded the expert's report, noting the Division's audiologist did not examine Neil, did not meet his caregivers, and reviewed only certain unspecified records. The judge also concluded it would be unfair to Neil to allow the Division to produce an unannounced expert so far into the proceeding. Similarly, the judge denied the Division's request to add fact witnesses to its list, reminding counsel the hearing started "months ago," it was delayed to accommodate the parties' needs, and he was not prepared to "toss out any kind of discovery process and rules of court to just start naming witnesses as we go along because our case isn't what we thought it was when we started. That's not how it works."

At the close of the hearing in December 2019, the Division represented defendants were living in a New York shelter and were noncompliant with services. For example, defendants failed to attend their individual therapy

sessions and Jill missed all three substance abuse assessments scheduled in November 2019. The Division's adoption specialist also testified Meg did not attend bonding evaluations scheduled with defendants' expert and Neil, but Tom had attended one such evaluation. Further, the specialist testified he informed the Pratts about attending one of Neil's critical audiology appointments with Dr. Raia, and he affirmed he had emphasized to them how important it was for them to attend bonding evaluations with defendants' experts.

V.

When the hearing concluded, the judge determined it was in Neil's best interests to remain with the Masons. He explained he was not persuaded the Pratts fully understood the demands involved in caring for Neil, or that moving Neil to their New York home would be in Neil's best interests, given that his medical specialists were in New Jersey and "this [litigation] could go on for a while because we could have an appeal of the [termination decision]." Referring to Dr. Miller's testimony and crediting same, the judge found Neil would be traumatized if moved to the Pratts' home, stating:

> Why would you take a child that . . . doesn't speak, doesn't have a bond, put [him] in a car, in a train, take [him] away from the people that are [his] psychological parents and leave [him]alone? That child cannot communicate in any way, can't express . . . terror, . . . fear, . . . anxiety. Can't ask to go home, can't ask for

18

help, can't say what's going on, can't understand anything that's being said to him. Doctor Miller was absolutely right, why would you do that? It is terrifying, the thought of that.

The judge further accepted Dr. Miller's testimony that removing Neil from the Masons' home would trigger a "catastrophic loss" for the child. The judge noted even Dr. Wells acknowledged Neil would suffer some harm if moved from his existing home. Significantly, the judge also believed Dr. Raia's testimony that trauma could cause Neil to regress, adding, "[w]hat the Division is asking this court to do is potentially traumatize this child to the point where [he] will regress, possibly lose the ability to have language in [his] life." The judge perceived the Division's plan to remove Neil from the Masons and place him with the Pratts as "a big gamble," given Neil's hearing issues, because the Pratts "might not really understand everything that's involved." While the judge found the Pratts "tried to educate themselves in some way," "they did not start any sign language until recently. Mr. [Pratt] could not really show us any sign language when he was here in court and testified." The judge also cited to "lots of evidence in this case regarding the [Pratts] and their schedule and their ability to make time," concluding, "I do believe that it would be difficult for them to make all of [Neil's] appointments."

19

By comparison, considering the credible testimony provided by the Masons and Dr. Raia, the judge found the Masons had a "comprehensive and sufficient understanding of [Neil's] condition," provided "caring, consistent treatment," for Neil, asked for "the best schools, . . . the best equipment" for him, and ensured he received all necessary services. Further, the judge observed that not counting "therapists and other people that are providing different types of services," the Masons had attended ninety-one doctor's visits for Neil after he was placed with them. Finding Neil "does get sick quite often," and courts "routinely consider a child's medical condition when making decisions regarding . . . placement," the judge concluded Neil should remain with the Masons. Accordingly, he amended the permanency goal to include the termination of defendants' parental rights, followed by adoption by the Masons.

VI.

Dr. Miller conducted two additional bonding evaluations prior to the guardianship trial, one with defendants and the other with the Masons. He opined Jill's parental capacity remained "severely compromised," and although "recommended to receive [an] assessment for disability services, . . . [Jill] asserted strongly . . . she would do nothing that was recommended by the Division." The doctor noted Jill "continued to demonstrate significant parenting

deficits due to longstanding and chronic abuse of PCP" and placing Neil in her custody "would result in increasing and avoidable harm, risk to his safety, and exposure to emotional neglect." He added Jill had not "demonstrated minimal parental capacity and has delayed reunification." Regarding Lewis, Dr. Miller found he was "noncompliant with services," "dependent on [the] use of PCP," and "unable to provide minimal parenting skills" to care for Neil.

Dr. Miller concluded:

> Both adults spoke to [Neil] without making eye contact and appeared unable to use sign language in a way that [Neil] would respond. [Neil] vocalized minimally during the observation. Of some concern, both parents appear[ed] to laugh as [Neil] fell, suggesting lack of emotional responsiveness . . . .
>
> Finally, the record reflects significant efforts have been made by [the Division] to engage the biological parents in supervised visitation and supportive interactions with family friends during supervised visits. It remains concerning . . . neither parent has appeared to demonstrate sufficiently positive parenting skills from learning or support.
>
> It is apparent both parents continue to demonstrate significant parenting deficits for providing safety, minimal nurturance, empathic responses, or redirection. [Neil] will not experience harm or emotional reaction if separated from the biological parents by the court. He will not experience more harm than good if separated from the biological parents.

Conversely, following his bonding evaluation with the Masons, Dr. Miller found Neil experienced "increasing vocalization in the presence of both resource parents, who communicated with him with eye contact, sign language, and reinforcing language based on his vocalizations." The doctor also determined the Masons and Neil had a "strong positive emotional bond between [them]" and separating Neil from his resource parents "would result in immediate and enduring harm" to the child. He reported:

> It is in the best interest of [Neil] and the least detrimental alternative to remain in the home of the resource parents for the purpose of adoption if . . . ordered by the court. [Neil] will continue to overcome significant early challenges to his development, develop further resilience, and he will emotionally/cognitively thrive in the home of the resource parents to achieve need permanency.

## VII.

The guardianship trial commenced in January 2020 and concluded the next month. When the trial began, the Division informed the court it would not relitigate Neil's placement with the Masons. The judge advised counsel that while he would not reopen the "best interest matters," given his recent placement decision, he would not preclude defendants from addressing "reasonable efforts issues" related to Neil's placement.

22

The Division called two witnesses at the guardianship trial, namely Dr. Wells and its adoption specialist; the Law Guardian called Dr. Miller and Ann to testify. Defendants did not present witnesses or documentary evidence at the guardianship trial. Ann and the Division's adoption specialist provided testimony consistent with their testimony at the best interests hearing. Similarly, Dr. Miller's testimony aligned with his report from his most recent bonding evaluations. For example, he again testified if Neil were removed from the Masons' home, "[i]t would be catastrophic to his development. He would lose all of his gains . . . . And that would be a life-long problem that would never go away."

Likewise, Dr. Wells again opined neither defendant was able to assume care for Neil "in the foreseeable future," explaining defendants' "lack of . . . stable housing [and] their inability to manage their own lives independent of assistance" led her to conclude returning Neil to either one of his parents' care would create a risk of "grave and severe" harm. She testified Jill's cognitive limitations were "not changeable" and Lewis' intellectual capacity was "not subject to change." Moreover, she opined if Neil were removed from the Masons, he would experience "a sense of bewilderment, confusion." She opined Neil considered his resource parents his "psychological parents" given their

23

"continuity of care . . . and because of how they've responded to his needs." Regarding defendants' ability to mitigate any loss Neil would experience if removed from the Masons' custody, Dr. Wells believed defendants would "engage in some sort of minimization of that loss."

## VIII.

On February 21, 2020, the trial judge issued a thoughtful and comprehensive thirty-page opinion, finding the Division met its statutory burden for termination under N.J.S.A. 30:4C-15.1(a). In support of his termination decision, the judge painstakingly reviewed the factual and procedural background of this matter, the results of various evaluations, and the testimony adduced at the best interests hearing, as well as the guardianship trial.

Preliminarily, the judge stated, "the court's rationale in deciding the best interest hearing [was] important to understanding the court's decision to terminate [defendants'] parental rights." He noted he granted the request for a best interest hearing based on the representation of counsel that "there would be two reasonably plausible placement plans." After hearing expert testimony at the best interests hearing, the judge found "the competing placements were not equally reasonably plausible," and in fact, "the Division's placement plan [involving the Pratts] was simply put, implausible." The judge concluded what

"the Division was essentially asking the court to do was to potentially traumatize the child in order to try to forge or increase a bond with non-relatives, which would cause [Neil] to regress and potentially lose his language ability," whereas "there was clear and consistent evidence that the [Masons] are providing [Neil] with what he needs to continue to thrive . . . . The child is placed exactly where he needs to be."

Next, the judge outlined how the Division established, by clear and convincing evidence, each of the four prongs of the best interest standard under N.J.S.A. 30:4C-15.1. After assessing each prong and concluding the Division carried its burden, the judge terminated defendants' parental rights.

IX.

On appeal, defendants argue the trial court erred in finding the Division satisfied the four-pronged best interests test under N.J.S.A. 30:4C-15.1(a). Further, Jill contends: (1) the best interests hearing "did not afford [her] due process on the need for an expert audiologist"; (2) the trial court erred in rejecting the Division's permanency plan after denying expanded visits for the Pratts and a defense bonding evaluation, thereby depriving defendants of "an adequate opportunity to present" evidence about whether the Division's plan was in Neil's best interests; (3) the placement decision at the conclusion of the best

interests hearing "failed to give due regard to [defendants'] choice of care providers and sibling rights, and was not objectively reasonable"; and (4) the Division "should be judicially estopped from seeking termination" of her parental rights because she was prejudiced at the guardianship trial by the Division's "inconsistent positions."

In addition to contending the Division failed to satisfy its burden under N.J.S.A. 30:4C-15.1(a), Lewis argues the trial court erred by approving a permanency plan that included adoption by resource parents when there were "candidates for adoption who were already approved, and willing to adopt."

We have considered these contentions and conclude they are unpersuasive. We add the following comments.

When a trial court is confronted with two "reasonably plausible" placement plans, "[n]either of the proposed plans is entitled to a presumption of correctness. The court is to receive testimony, evidence and information from all relevant sources pertaining to [the child's] best interests and determine a permanency plan that ensures [his or] her safety and health and serves [his or] her best interests." In re C.R., 364 N.J. Super. 263, 283 (App. Div. 2003). Upon appellate review, findings by the trial judge are considered binding "when supported by adequate, substantial and credible evidence." Rova Farms Resort,

Inc. v. Inv. Ins. Co. of Am., 65 N.J. 474, 484 (1974). In particular, "[b]ecause of the family courts' special jurisdiction and expertise in family matters, appellate courts should accord deference to family court factfinding." Cesare v. Cesare, 154 N.J. 394, 413 (1998).

Here, the record contains overwhelming credible evidence to support the trial court's finding it was in Neil's best interest to continue his placement with the Masons. As we have noted, following several trial days and after considering the testimony of multiple witnesses, including the divergent opinions of Drs. Wells and Miller, the judge credited Dr. Miller's testimony over that of Dr. Wells when opting to place Neil with the Masons rather than the Pratts.

The trial court has the authority to weigh and evaluate expert testimony. N.J. Div. of Youth & Fam. Servs. v. J.S., 433 N.J. Super. 69, 93 (App. Div. 2013). The weight afforded an expert's opinion is entirely within the court's discretion and we are satisfied that discretion was not abused here. See Cnty. of Middlesex v. Clearwater Vill., Inc., 163 N.J. Super. 166, 173-74 (App. Div. 1978). Our conclusion is bolstered by the fact Drs. Miller and Wells did not dispute the Masons provided exceptional care for Neil and ensured his daily physical, emotional and medical needs were met.

A-2772-19

To the extent defendants contend the trial court erred in "approving a permanency plan that included adoption by the resource parents" when there were "kinship candidates" preferred by defendants, we disagree. KLG is only available when adoption is "neither feasible nor likely." N.J. Div. of Youth & Fam. Servs. v. P.P., 180 N.J. 494, 513 (2004). It cannot be used as a defense to termination of parental rights. Ibid. Here, the Masons consistently confirmed they wished to adopt Neil. Additionally, regardless of defendants' preference to have Neil placed with the Pratts rather than the Masons, the trial court was not obliged to defer to their preference. Even if the judge found the Pratts were defendants' relatives, which he did not, "there is no presumption favoring the placement of a child with such relatives." J.S., 433 N.J. Super. at 82. "Rather, 'a presumption of custody only exists in favor of a natural parent as opposed to placement with relatives or foster parents.'" Ibid. (quoting N.J. Div. of Youth & Fam. Servs. v. M.F., 357 N.J. Super. 515, 527 n.3 (App. Div. 2003)). Moreover, a trial court's paramount consideration is the selection of a placement plan that best serves a child's interests. In re C.R., 364 N.J. Super. at 283.

Regarding Jill's argument her due process rights were violated based on a lack of notice that an opinion from an expert audiologist was warranted, we are not persuaded. The record reflects Neil's medical needs, and the ability of any

proposed caregiver to meet those needs, including those related to his hearing loss, were central to this litigation. Further, the multiple evaluations conducted throughout this litigation confirmed as much. Moreover, the record reflects the Law Guardian included Dr. Raia on her witness list roughly two months prior to the best interests hearing. Additionally, all parties knew months in advance when the best interests hearing was due to occur, and at defendants' request, the best interests hearing was postponed from August 20, 2019 to October 1, 2019 to provide defendants additional time to prepare for the hearing. Importantly, defendants also were advised in August 2019 that Dr. Raia would be testifying when the hearing commenced on October 1, 2019. Under these circumstances, we are not convinced defendants were denied due process.

We also decline to find the judge abused his discretion in precluding the Division from introducing a letter from an audiologist and adding the expert to its witness list after the hearing was well underway. The judge characterized the audiologist's letter as a "net opinion" which "doesn't weigh as much as the paper it's on. It's a doctor saying, if the patient does everything they're supposed to do, they'll be fine." The judge reasoned the Division's audiologist had not reviewed Dr. Raia's records, and noted the expert "has not even met with this child . . . . [and] has not examined this child. He has not met with the resource

parents. He's not met with . . . the [Pratts]. So it's obviously a net opinion." Moreover, the judge determined the Division was attempting to serve a "one-page, three sentence opinion expert report" "way too late." Further, he again expressed concern about "delaying [Neil's] permanency."

Evidentiary rulings are reviewed under an abuse of discretion standard. N.J. Div. of Child Prot. & Permanency v. K.G., 445 N.J. Super. 324, 342 (App. Div. 2016). "Absent a manifest denial of justice, we do not disturb a trial judge's reasoned exercise of his or her broad discretion when making relevance and admissibility determinations." N.J. Div. of Youth & Fam. Servs. v. N.S., 412 N.J. Super. 593, 622 (App. Div. 2010) (citing Lancos v. Silverman, 400 N.J. Super. 258, 275 (App. Div. 2008)). Further, while parties generally are permitted to present expert witnesses, a "trial judge's discretion in excluding evidence is broad." Ratner v. Gen. Motors Corp., 241 N.J. Super. 197, 202 (App. Div. 1990). "The decision as to exclusion must stand unless so wide of the mark that a manifest denial of justice resulted." Ibid. No such manifest denial of justice occurred here. Thus, we perceive no basis to disturb the judge's decision to exclude the testimony and late report from the Division's audiologist.

Regarding defendants' contention their requests for bonding evaluations were improperly denied, we are convinced this argument is belied by the record.

Although defendants were informed in May 2019 that the best interests hearing would proceed on August 20, 2019, they failed to timely obtain bonding evaluations between Neil and the Pratts. Thereafter, the judge granted their request for additional time to secure bonding evaluations. Although the hearing was postponed for several more weeks, defendants complained they encountered scheduling issues for the bonding evaluations. Given Neil's need for permanency, the judge made clear he did not wish to further delay the hearing, but left open the possibility for defendants to introduce a late expert's report. We decline to second-guess the judge's discretionary decision in this regard.

Likewise, we are not offended by the judge's response to defendants' belated request to obtain bonding evaluations for the Pratts for use in the guardianship trial. The record reflects the judge did not reject the request for the evaluations out of hand. Rather, he simply stated he would not "allow any evaluations of the [Pratts] at this time, subject to the ruling in this [placement] case."

Defendants also argue the trial court erred by refusing to grant the Pratts overnight or extended daytime visits prior to rendering a decision about Neil's placement. Again, we disagree. The judge had no obligation to grant visits to "create a psychological bond or increase a psychological bond" with the Pratts

31

at the cost of Neil's wellbeing, particularly since he was thriving in the Mason's home.  See In re of Guardianship of S.C., 246 N.J. Super. 414, 426 (App. Div. 1991).

## X.

Finally, we consider defendants' contention the Division failed to prove the four prongs of the "best interests of the child" test under N.J.S.A. 30:4C-15.1(a).  Once again, we are not convinced.

In reviewing a decision to terminate parental rights, we recognize our scope of review of the trial court's factual findings is limited.  N.J. Div. of Youth & Fam. Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012).  "A Family Part's decision to terminate parental rights will not be disturbed when there is substantial credible evidence in the record to support the court's findings."  N.J. Div. of Child Prot. & Permanency v. K.T.D., 439 N.J. Super. 363, 368 (App. Div. 2015).  We owe deference to the trial judge's evaluation of witness credibility, N.J. Div. of Youth & Fam. Servs. v. F.M., 211 N.J. 430, 446 (2012), and review a trial judge's evidentiary rulings for an abuse of discretion, K.G., 445 N.J. Super. at 342 (citing State v. J.A.C., 210 N.J. 281, 295 (2012)).  On the other hand, we review a trial court's legal interpretations de novo.  N.J. Div. of Youth & Fam. Servs. v. R.G., 217 N.J. 527, 552 (2014).

Parents have a "constitutional right 'to raise [their] child and maintain a relationship with that child, without undue interference by the state.'" N.J. Div. of Child Prot. & Permanency v. S.D., 453 N.J. Super. 511, 518 (App. Div. 2018) (quoting N.J. Div. of Youth & Fam. Servs. v. A.L., 213 N.J. 1, 18 (2013)). However, parental rights are not absolute. In re Guardianship of K.H.O., 161 N.J. 337, 347 (1999). They are balanced against the State's responsibility to protect the welfare of children, and courts use the best interests of the child standard to balance these interests. Ibid. (citing In re Guardianship of J.C., 129 N.J. 1, 10 (1992)).

A court may terminate parental rights only if the Division proves, by clear and convincing evidence, the four prongs of the "best interest" test. N.J. Div. of Youth & Fam. Servs. v. A.W., 103 N.J. 591, 604-11 (1986). Specifically, the Division must show by clear and convincing evidence that:

> (1) The child's safety, health or development has been or will continue to be endangered by the parental relationship;
>
> (2) The parent is unwilling or unable to eliminate the harm facing the child or is unable or unwilling to provide a safe and stable home for the child and the delay of permanent placement will add to the harm. Such harm may include evidence that separating the child from his resource family parents would cause serious and enduring emotional or psychological harm to the child;

(3) The division has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home and the court has considered alternatives to termination of parental rights; and

(4) Termination of parental rights will not do more harm than good.

[N.J.S.A. 30:4C-15.1(a).]

The considerations involved in applying the best interest test are "extremely fact sensitive and require particularized evidence" addressing the specific circumstances of the case. M.M., 189 N.J. at 280 (quoting N.J. Div. of Youth & Fam. Servs. v. R.L., 388 N.J. Super. 81, 88 (App. Div. 2005)). The four prongs "are not discrete and separate; they relate to and overlap with one another to provide a comprehensive standard that identifies a child's best interests." K.H.O., 161 N.J. at 348.

Under prong one, "the [Division must] demonstrate harm to the child by the parent," such as "the endangerment of the child's health and development resulting from the parental relationship." Ibid. The focus is not on a "single or isolated harm." Ibid. Prong one "addresses the risk of future harm to the child . . . . " N.J. Div. of Youth & Fam. Servs. v. H.R., 431 N.J. Super. 212, 222 (App. Div. 2013). "Courts need not wait to act until a child is actually irreparably

impaired by parental inattention or neglect." In re Guardianship of D.M.H., 161

N.J. 365, 383 (1999).

Under prong two, the Division must show a parent is unable or unwilling

to correct the circumstances that led to the Division's involvement. K.H.O., 161

N.J. at 348-49. "The question is whether the parent can become fit in time to

meet the needs of the child." N.J. Div. of Youth & Fam. Servs. v. T.S., 417 N.J.

Super. 228, 244 (App. Div. 2010). Additionally, the Division may prove prong

two by establishing "that the parent is unable to provide a safe and stable home

for the child and that the delay in securing permanency continues or adds to the

child's harm." K.H.O., 161 N.J. at 348-49.

Under prong three, the Division must show it made reasonable efforts to

provide services and considered alternatives to termination of parental rights.

N.J.S.A. 30:4C-15.1(a)(3). Reasonable efforts include:

> (1) consultation and cooperation with the parent in developing a plan for appropriate services;
>
> (2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;
>
> (3) informing the parent at appropriate intervals of the child's progress, development, and health; and
>
> (4) facilitating appropriate visitation.

[N.J. Div. of Child Prot. & Permanency v. T.D., 454 N.J. Super. 353, 382 (App. Div. 2018) (citing N.J.S.A. 30:4C-15.1(c)).]

In analyzing this prong, the Division's "efforts to provide services '[are] not measured by their success.'" N.J. Div. of Youth & Fam. Servs. v. A.R., 405 N.J. Super. 418, 441 (App. Div. 2009) (quoting D.M.H., 161 N.J. at 393). The reasonableness of these efforts is evaluated on a case-by-case basis. Ibid. Where the Division has exerted efforts such as seeking out relatives to care for the children, supporting the parent in maintaining a relationship with the children, supervising visitation, and sending a parent to therapy and treatment programs, the third prong is satisfied, despite the parent's failure to rehabilitate him or herself. See K.H.O., 161 N.J. at 354.

Under prong four, the Division must prove the termination of parental rights will not do more harm than good. N.J.S.A. 30:4C-15.1(a)(4). To evaluate whether the Division met this criterion, the court weighs the harm that a child might suffer from the termination of parental rights against any harm stemming from the removal from the resource placement. K.H.O., 161 N.J. at 355. It does not require a showing that a child will suffer no harm as a result of severing a child's relationship with the child's biological parents. Ibid. The question is "whether, after considering and balancing the two relationships, the child will

36

suffer a greater harm from the termination of ties with [his] natural parents than from permanent disruption of [his] relationship with [his] foster parents." N.J. Div. of Youth & Fam. Servs. v. I.S., 202 N.J. 145, 181 (2010) (quoting In re Guardianship of J.N.H., 172 N.J. 440, 478 (2002)).

Here, it is clear the judge's detailed findings regarding prongs one and two were tethered to substantial competent, credible evidence, including expert testimony, which overwhelmingly demonstrated defendants had endangered and would continue to endanger Neil, as they continued to use PCP, were homeless, and noncompliant with services.

Additionally, we discern no error in the judge's finding the Division met prong three considering its "reasonable efforts" to reunify defendants with Neil and its assessment of alternatives to termination. The record reflects the Division provided defendants with transportation, supervised visits, urine screens, substance abuse evaluations, and psychological and bonding evaluations, and considered placement with the Pratts once a series of evaluations confirmed defendants could not and would not be able to care for Neil for the foreseeable future.

Regarding prong three, the Division and Law Guardian contend defendants now raise the novel argument there was no evidence the Division

provided services to them to address their cognitive limitations, and Jill newly argues the lack of such services violated the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101. Jill counters that she raised the issue of reasonable accommodations before the trial court, and points to a brief statement her counsel made in his closing argument.

Our review of the record reveals neither defendant discussed the ADA or how it related to prong three at closing argument. Instead, in summation, Jill's counsel merely stated, "the issue as we presented to Your Honor is whether these parents can safely parent [Neil] now with a reasonable accommodation given to them." To the extent this passing comment can be construed as raising an ADA argument, we are not convinced the argument has merit. The Division provided numerous services to defendants to assist defendants in overcoming their disabilities. Nonetheless, the trial court accepted Dr. Wells' testimony that defendants' cognitive limitations would not change and they would "never be able to parent independently." He added, "[n]o amount of time can change that. No services or therapy can change that." Additionally, the record reflects defendants were noncompliant with services offered, and their ongoing struggles with substance abuse and homelessness impacted their ability to parent. Moreover, as we have stated, allowing "the provisions of the ADA to constitute

a defense to a termination proceeding would improperly elevate" the parent's rights above the child. N.J. Div. of Youth & Fam. Servs. v. A.G., 344 N.J. Super. 418, 442 (App. Div. 2001).

Finally, regarding prong four, the judge relied on Dr. Miller's testimony and the results of the expert's comparative bonding evaluations to find Neil had a strong, secure bond with the Masons, the child lacked an emotional bond with his parents, and termination of defendants' parental rights would not do more harm than good. We discern no error in this regard.

Because we perceive no basis to disturb the judge's factual findings, his legal determination that the Division satisfied its burden under N.J.S.A. 30:4C-15.1(a) is unassailable. To the extent we have not specifically addressed any of defendants' remaining arguments, we are satisfied they are without sufficient merit to warrant discussion in this opinion. R. 2:11-3(e)(1)(E).

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-2772-19